Mark Rumold (SBN 279060)
*mark@eff.org*
Jennifer Lynch (SBN 240701)
*jlynch@eff.org*
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Attorneys for Plaintiff
ELECTRONIC FRONTIER FOUNDATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>DEPARTMENT OF COMMERCE,<br><br>　　　　　　　　　　　　Defendant. | Case No.: 12-cv-3683 TEH<br><br>**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFEDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 29, 2013<br>Tine: 10:00 a.m.<br>Courtroom 12 – 19th Floor<br>Hon. Thelton E. Henderson |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on April 29, 2013 at 10:00 am, or as soon thereafter as the matter may be heard in Courtroom 12, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, the Honorable Thelton E. Henderson presiding, plaintiff Electronic Frontier Foundation ("EFF"), will, and hereby does, cross move this Court for summary judgment on all of its claims. Pursuant to Federal Rule of Civil Procedure 56, EFF seeks a court order requiring defendant Department of Commerce to release records under the Freedom of Information Act, 5 U.S.C. § 552. EFF respectfully asks that this Court issue an order requiring defendant to release all records improperly withheld from the public. This cross motion is based on this notice of cross motion, the memorandum of points and authorities in support of this cross motion, the Declaration of Mark Rumold ("Rumold Decl."), and all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

## STATEMENT OF RELIEF REQUESTED

Plaintiff respectfully requests this Court grant summary judgment in favor of plaintiff and order defendant to produce records responsive to plaintiff's FOIA request.


DATED:  February 20, 2013

Respectfully submitted,

By   /s/ *Mark Rumold*
Mark Rumold
Jennifer Lynch
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA  94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
mark@eff.org

Attorneys for Plaintiff
ELECTRONIC FRONTIER FOUNDATION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS .............................................................................................2

    1.    The Use of American-Made Surveillance Technology in Repressive Regimes Throughout the World ....................................................................................2

    2.    Regulatory Background and Defendant's Role in the Export of Surveillance Technology ........................................................................................................4

    3.    EFF's FOIA Request for Records Concerning Exports of Surveillance Technology ........................................................................................................6

ARGUMENT ..................................................................................................................6

    I.    FOIA, SUMMARY JUDGMENT, AND THIS COURT'S *DE NOVO* REVIEW ........................................................................................................6

    II.    FOIA'S EXEMPTION 3 DOES NOT SHIELD THE REQUESTED RECORDS FROM DISCLOSURE ..................................................................8

        A.    A "Legislative Scheme" is Not a Collateral "Statute" that Justifies Defendant's Exemption 3 Withholdings ....................................................8

            1.    Because the EAA Lapsed Over a Decade Ago, It Is Not a Statute for Exemption 3 Purposes ............................................................9

            2.    IEEPA's Sweeping Provisions Do Not Constitute a Withholding Statute Under Exemption 3 ..........................................................10

            3.    An Executive Order is Not a Statute and Therefore Cannot Justify Withholding Under Exemption 3 ......................................11

        B.    The Current, Decade-Long Lapse in the EAA Makes This Case Factually Distinguishable from Both *Times Publishing* and *Wisconsin Project* ..........................................................................................................12

            1.    Congress Reenacted the EAA in Response to Pending Litigation and to Give Commerce the Authority to Withhold Records Under Exemption 3 ..........................................................................13

            2.    Both the *Times Publishing* and *Wisconsin Project* Cases Must Be Interpreted as Recognitions of the Congressional Action to Affect Those Cases ............................................................................15

C.  Defendant's Reliance on "the Actions of Concerned Entities" is Misplaced and Beside the Point ................................................... 17

D.  The Supreme Court's Decision in *Milner* Makes Clear that Defendant's "Text-Light" Approach to Exemption 3 is Incorrect .................................. 19

III.  DEFENDANT HAS FAILED TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS, HAS ASSERTED EXEMPTIONS 4 AND 5 MORE BROADLY THAN THE LAW ALLOWS, AND HAS FAILED TO COMPLY WITH FOIA'S SEGREGABILITY REQUIREMENTS ............................................. 20

A.  Defendant Has Failed to Conduct an Adequate Search for Responsive Records ................................................................................... 22

B.  Defendant's Claims Under Exemptions 4 and 5 are Inadequately Supported and Patently Overbroad ................................................ 23

1.  Defendant's Claims Under Exemption 4 Are Overbroad ............. 24

2.  Defendant's Claims Under Exemption 5 Appear Similarly Overbroad ...................................................................................... 26

C.  Defendant Has Failed to Comply with FOIA's Segregability Requirement ........................................................................................ 27

CONCLUSION ................................................................................................................ 28

# TABLE OF AUTHORITIES

## Federal Cases

*American Jewish Cong. v. Kreps*,
  574 F.2d 624 (D.C. Cir. 1978)................................................................ 20

*Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State*,
  818 F. Supp. 1291 (N.D. Cal. 1992)................................................... 21, 27

*Burke v. Barnes*,
  479 U.S. 361 (1987) ............................................................................ 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................ 7

*Chamber of Commerce v. Reich*,
  83 F.3d 439 (D.C. Cir. 1996)................................................................ 11

*Church of Scientology v. Dep't of the Army*,
  611 F.2d 738 (9th Cir. 1979)................................................................ 27

*Church of Scientology v. IRS*,
  995 F.2d 916 (9th Cir. 1993)........................................................... 7, 11

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980).............................................................. 26

*Critical Mass Energy Project v. Nuclear Regulatory Com'n*,
  975 F.2d 871 (D.C. Cir. 1992).............................................................. 24

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) ............................................................................... 7

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989) ......................................................................... 6, 7

*Dep't of Justice v. Tax Analysts*,
  492 U.S. 136 (1989) ............................................................................ 7

*Dep't of the Air Force v. Rose*,
  425 U.S. 352 (1976) ........................................................................... 19

*Dunaway v. Webster*,
  519 F.Supp. 1059 (N.D. Cal. 1981)....................................................... 23

*Elliott v. Dep't of Agric.*,
  596 F.3d 842 (D.C. Cir. 2010).............................................................. 20

*Feshbach v. SEC,*
    5 F. Supp. 2d 774 (N.D. Cal. 1997)...................................................................... 7

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990)........................................................................... 8

*Founding Church of Scientology v. Bell,*
    603 F.2d 945 (D.C. Cir. 1979)......................................................................... 11

*Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.,*
    656 F.2d 856 (D.C. Cir. 1981)......................................................................... 11

*GC Micro Corp. v. Def. Logistic Agency,*
    33 F.3d 1109 (9th Cir. 1994) ...................................................................... 24, 25

*Goland v. CIA,*
    607 F.2d 339 (D.C. Cir. 1978).......................................................................... 7

*Gordon v. FBI,*
    390 F. Supp. 2d 897 (N.D. Cal. 2004)................................................................ 8

*Green v. Dep't of Commerce,*
    468 F. Supp. 691 (D.D.C. 1979)...................................................................... 24

*Greenwood v. Freight Co.,*
    105 U.S. 13 (1881) ........................................................................................ 9

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of America v. Donovan,*
    746 F.2d 855 (D.C. Cir. 1984)......................................................................... 18

*Irons & Sears v. Dann,*
    606 F.2d 1215 (D.C. Cir. 1979)....................................................................... 12

*Johnson v. Transportation Agency,*
    480 U.S. 616 (1987) ..................................................................................... 18

*Judicial Watch v. USPS,*
    297 F. Supp. 2d 252 (D.D.C. 2004)............................................................ 21, 26

*Lessner v. Dep't of Commerce,*
    827 F.2d 1333 (9th Cir. 1987) ...................................................................... 9, 24

*Lion Raisins, Inc. v. U.S. Dept. of Agric.,*
    354 F.3d 1072 (9th Cir. 2004) ........................................................................ 25

*Mead Data Central, Inc., v. Dep't of the Air Force,*
    566 F.2d 242 (D.C. Cir. 1977)........................................................................ 21

*Mgmt. Recruiters Intern., Inc. v. Bloor,*
    129 F.3d 851 (6th Cir. 1997) .......................................................................... 12

*Milner v. Dep't of the Navy,*
    562 U.S. __, 131 S. Ct. 1259 (2011) ........................................................ 19, 20

*Minier v. CIA,*
    88 F.3d 796 (9th Cir. 1996) ..................................................................... 8

*Mudge Rose Guthrie Alexander & Ferdon v. U.S. Inter'l Trade Comm'n,*
    846 F.2d 1527 (D.C. Cir. 1988) ............................................................... 8

*Nat'l Assoc. of Home Builders v. Norton,*
    309 F. 3d 26 (D.C. Cir. 2002) .............................................................. 10, 11

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.,*
    861 F.2d 1114 (9th Cir. 1988) ............................................................. 7, 27

*Nation Magazine v. U.S. Customs Serv.,*
    71 F.3d 885 (D.C. Cir. 1995) ................................................................ 23

*National Parks and Conservation Ass'n v. Morton,*
    498 F.2d 765 (D.C. Cir. 1974) ........................................................... 24, 25

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) .............................................................................. 7

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ......................................................................... 23, 26

*NRDC v. Dep't of Defense,*
    388 F. Supp. 2d 1086 (C.D. Cal. 2005) .............................................. 27, 28

*Pacific Fisheries, Inc. v. United States,*
    539 F.3d 1143 (9th Cir. 2008) ............................................................... 27

*Paisley v. CIA,*
    712 F.2d 686 (D.C. Cir.1983) ............................................................... 27

*Pub. Citizen Health Research Grp. v. FDA,*
    704 F.2d 1280 (D.C. Cir. 1983) ..................................................... 10, 11, 24

*Public Citizen v. USTR,*
    804 F. Supp. 385 (D.D.C. 1992) ........................................................... 11

*Raher v. Fed. Bureau of Prisons,*
    749 F. Supp. 2d. 1148 (D. Ore. 2010) .................................................... 25

*Reporters Comm. for Freedom of the Press v. Dep't of Justice,*
    816 F.2d 730 (D.C. Cir. 1987) .............................................................. 11

*Sullivan v. Finklestein,*
    496 U.S. 617 (1990) ............................................................................ 18

*Times Publishing Co. v. Dep't of Commerce,*
    236 F.3d 1286 (11th Cir. 2001) ............................................................. *passim*

*Trans-Pacific Policing Agreement,*
    177 F.3d 1022 (D.C. Cir. 1999) ............................................................. 27

*United States v. Mechanic,*
    809 F.2d 1111 (5th Cir. 1987) ............................................................. 19

*United States v. Spawr Optical Research, Inc.,*
    685 F.2d 1076 (9th Cir. 1982) ............................................................. 18

*United States v. Trucking Mgmt., Inc.,*
    662 F.2d 36 (D.C. Cir. 1981) ............................................................. 12

*Vaughn v. Rosen,*
    484 F.2d 820 (D.C. Cir. 1973) ............................................................. 21, 28

*Watkins v. CBP,*
    643 F.3d 1189 (9th Cir. 2011) ............................................................. 24, 25

*Wiener v. FBI,*
    943 F.2d 972 (9th Cir. 1991) ............................................................. 27

*Wisconsin Project on Nuclear Arms Control v. Dep't of Commerce,*
    317 F.3d 275 (D.C. Cir. 2003) ............................................................. *passim*

*Wong Yang Sung v. McGrath,*
    339 U.S. 33 (1950) ............................................................. 20

*Zemansky v. EPA,*
    767 F.2d 569 (9th Cir. 1985) ............................................................. 22

**Federal Statutes**

1 U.S.C. § 112 ............................................................. 9

1 U.S.C. § 204(a) ............................................................. 9

2 U.S.C. § 285b ............................................................. 9

5 U.S.C. § 552 ............................................................. 1

5 U.S.C. § 552(a)(4)(B) ............................................................. 7

5 U.S.C. § 552(b) ............................................................. 7, 27

5 U.S.C. § 552(b)(3) ............................................................. *passim*

5 U.S.C. § 552(b)(4) ............................................................. 2, 23, 24, 25, 26

5 U.S.C. § 552(b)(5) ............................................................................................ 23, 26, 27

50 U.S.C. §§ 1701-1706 ....................................................................................................... 10

50 U.S.C. § 1702(a)(1) ......................................................................................................... 11

50 U.S.C. § 1702(a)(1)(B) .......................................................................................... *passim*

**Federal Rules**

Fed. R. Civ. P. 56(c) .............................................................................................................. 7

**Federal Regulations**

15 C.F.R. § 738.2 (2012) ....................................................................................................... 5

15 C.F.R. Pts. 730 -774 (2012) ............................................................................................. 5

15 C.F.R. Pt. 750 (2012) .................................................................................................. 6, 25

15 C.F.R. § 774 (Supplement No. 1) (2012) ......................................................................... 6

77 Fed. Reg. 39358 (July 2, 2012) ...................................................................................... 22

**Legislative Materials**

50 U.S.C. App. § 2411(c) ........................................................................................... 9, 17, 18

50 U.S.C. App. § 2419 ........................................................................................................... 9

146 Cong. H11575 (daily ed. Oct. 30, 2000) ...................................................................... 14

146 Cong. Rec. H11576 (daily ed. Oct. 30, 2000) .............................................................. 14

146 Cong. Rec. H8022 (daily ed. Sept. 25, 2000) ......................................................... 13, 14

146 Cong. Rec. S11365 (daily ed. Oct. 30, 2000) .............................................................. 14

Export Administration Act of 1969, Pub. L. No. 91-184, 83 Stat. 841 ................................ 5

Export Administration Act of 1979, Pub. L. No. 96-72, 93 Stat. 503 ...................... *passim*

Export Control Act of 1949, Pub. L. No. 81-11, 63 Stat. 7 ................................................. 4

Pub. L. No. 103-277, 108 Stat. 1407 .................................................................................... 5

Pub. L. No. 82-33; 65 Stat. 43 .............................................................................................. 4

Pub. L. No. 83-62, 67 Stat. 62 .............................................................................................. 4

Pub. L. No. 84-631, 70 Stat. 407, 408 ..................................................................... 4

Pub. L. No. 85-466, 72 Stat. 220 ............................................................................ 4

Pub. L. No. 86-464, 74 Stat. 130 ............................................................................ 4

Pub. L. No. 87-515, 76 Stat. 127-28 ....................................................................... 4

Pub. L. No. 89-63, 79 Stat. 209-10 ......................................................................... 4

Pub. L. No. 95-223, 91 Stat. 1626 .......................................................................... 10

Pub. L. No. 96-72, 93 Stat. 503 .............................................................................. 9

Pub. L. No. 98-207, 97 Stat. 1391 ........................................................................... 5

Pub. L. No. 106-508; 114 Stat. 2360 ................................................................ 5, 13

## Executive Orders

Exec. Order No. 11,796, 39 Fed. Reg. 27,891 (July 30, 1975) ................................ 5

Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17, 2001) ............................... 5

## Other Authorities

*About the Office and the United States Code*, OFFICE OF THE LAW REVISION COUNSEL ................... 9

Black's Law Dictionary 1410 6th ed. 1990 ............................................................. 12

Charles S. Zinn, *Revision of the United States Code*, 51 Law Libr. J. 388 (1958) ........................... 9

James Glanz & John Markoff, *Egypt Leaders Found 'Off' Switch for Internet*, N.Y. Times (Feb. 15, 2011) ................................................................................................... 3

Jennifer Valentino-Devries, *et al.*, *U.S. Firm Acknowledges Syria Uses Its Gear to Block Web*, Wall St. J. (Oct. 29, 2011) ..................................................................................... 3

Loretta Chao & Don Clark, *Cisco Poised to Help China Keep an Eye on Its Citizens*, Wall St. J. (July 5, 2011) ....................................................................................................... 4

Paul Sonne & Steve Stecklow, *U.S. Products Help Block Mideast Web*, Wall St. J. (Mar. 27, 2011) ...................................................................................................... 3

Robert Poe, *The Ultimate Net Monitoring Tool*, Wired (May 17, 2006) ......................... 3

Trevor Lloyd-Jones, *Narus Signs Regional License with Giza Systems*, Business Intelligence Middle East (Sep. 14, 2005) ........................................................................................................ 3

Vernon Silver & Ben Elgin, *Torture in Bahrain Becomes Routine With Help From Nokia Siemens*, Bloomberg News (Aug. 22, 2011) ................................................................................................ 3

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff, the Electronic Frontier Foundation ("EFF"), brought this suit after Defendant, Department of Commerce ("Commerce"), wrongfully withheld records requested under the Freedom of Information Act, 5 U.S.C. § 552. EFF requested records from Defendant that would shed light on the federal government's role in facilitating the export of American-made surveillance technology to repressive regimes around the world – technology that is later used to surveil and suppress dissidents and human rights activists.

Defendant now claims that all responsive records may be withheld under Exemption 3 of FOIA, 5 U.S.C. § 552(b)(3), which requires a collateral statute clearly exempting the records from disclosure. Defendant has not pointed to a single statute in force today that would allow it to exempt the records at issue in this case. The statute Defendant purportedly relies on—the Export Administration Act ("EAA") of 1979 and its confidentiality provision—lapsed over a decade ago. As such, the records are improperly withheld under Exemption 3 and must be released.

Instead, Defendant urges this Court to ignore the text of Exemption 3 and allow the agency to rely on a comprehensive "legislative scheme" to withhold the requested records. Setting aside the impermissibility of such a "text-light" approach to FOIA, Defendant's characterization is flatly incorrect: the "*legislative* scheme" for regulating exports—the EAA—lapsed, along with its confidentiality provision, over a decade ago. The only comprehensive scheme that remains in place for regulating exports is a non-statutory, *administrative* one—a series of executive orders and regulations issued pursuant to a broad grant of authority under the International Emergency Economic Powers Act ("IEEPA"). But a legislative scheme and an administrative scheme are obviously different, and, under Exemption 3, only Congress—not the Executive Branch—has the authority to determine which records may be withheld from the public.

No court in this Circuit has determined that a non-statutory, regulatory "scheme" constitutes a "statute" for Exemption 3 purposes. The cases Defendant relies on – *Times Publishing Co. v. Dep't of Commerce*, 236 F.3d 1286 (11th Cir. 2001) ("*Times Publishing*") and *Wisconsin Project on Nuclear Arms Control v. Dep't of Commerce*, 317 F.3d 275 (D.C. Cir. 2003)

1

("*Wisconsin Project*")—are readily distinguishable in a vital respect: During the pendency of both cases, Congress reenacted the EAA, specifically to extend the confidentiality provision in response to those lawsuits. In contrast, here, Congress has not extended the confidentiality provision—and has allowed it to lapse for over a decade. Thus, any persuasive effect those opinions might have must be tempered by their critically distinctive factual bases.

Defendant also suggests that the actions and expectations of "concerned entities"— exporters, Congress, and the Executive Branch—can somehow serve as proof that Defendant's withholding claims under Exemption 3 are appropriate. However, the examples offered by Defendant are both unpersuasive and beside the point. The only inquiry relevant for Exemption 3 purposes is the existence of a collateral withholding statute. Because there is no such statute here, the Court's inquiry need not proceed any further.

Finally, Defendant's broad Exemption 3 claims obstruct both the Court and EFF from assessing the agency's compliance with FOIA's other requirements and Defendant's claims under Exemption 4 and 5. However, even without the partial release of any responsive records or a more fulsome description of the withheld records and their justification for non-disclosure, it appears Defendant has failed to conduct an adequate search for responsive records; has claimed Exemptions 4 and 5 more broadly than the law allows; and has failed to comply with FOIA's segregability requirements.

For these reasons, explained in more depth below, EFF respectfully urges this Court to enter an order compelling Defendant to release records responsive to EFF's FOIA request.

## STATEMENT OF FACTS

### 1.     The Use of American-Made Surveillance Technology in Repressive Regimes Throughout the World

Authoritarian regimes around the world increasingly rely on sophisticated technology to surveil activists and, ultimately, repress dissent. The interrogation of a man in Bahrain, as reported by Bloomberg News, is illustrative:

> First, Bahraini jailers armed with stiff rubber hoses beat the 39-year-old school administrator and human rights activist in a windowless room two stories below ground in the Persian Gulf kingdom's National Security Apparatus building. Then, they dragged him upstairs for questioning by a uniformed officer armed with

2

another kind of weapon: transcripts of his text messages and details from personal
mobile phone conversations, he says.

Vernon Silver & Ben Elgin, *Torture in Bahrain Becomes Routine With Help From Nokia Siemens*,
Bloomberg News (Aug. 22, 2011).[1] The surveillance technology used by these governments is
predominately developed by Western companies. While the technology relied on by the Bahraini
government was European, *see id.*, American companies, too, provide technology that is later used
for surveillance and repression of activists and dissidents. "U.S. technology [was . . .] used in the
clampdowns on uprisings across the Middle East" including in Egypt, Syria, and Tunisia. Paul
Sonne & Steve Stecklow, *U.S. Products Help Block Mideast Web*, Wall St. J. (Mar. 27, 2011).[2]

For example, Narus, a Silicon Valley-based company, produces equipment used to perform
"deep packet inspection"— equipment that can track, target, and intercept digital communications
as they pass through telecommunication networks. *See* Robert Poe, *The Ultimate Net Monitoring
Tool*, Wired (May 17, 2006).[3] Narus products have been linked to Telecom Egypt, Egypt's largest
(and state-owned) telecommunications company, a company that figured prominently in
crackdowns preceeding Egypt's recent revolution. *See* Trevor Lloyd-Jones, *Narus Signs Regional
License with Giza Systems*, Business Intelligence Middle East (Sep. 14, 2005)[4]; James Glanz &
John Markoff, *Egypt Leaders Found 'Off' Switch for Internet*, N.Y. Times (Feb. 15, 2011).[5]
Similarly, in Tunisia, government officials used technology developed by Western firms, such as
McAfee, to intercept and block communications on the Internet. *See e.g.*, Sonne & Stecklow,
*supra*.

And Egypt and Tunisia's experience is by no means unique: surveillance and filtering
technology developed in the West has been linked to regimes throughout the Middle East and the
world – including Syria, Libya, Yemen, and China. *See, e.g.*, Jennifer Valentino-Devries, *et al.*,
*U.S. Firm Acknowledges Syria Uses Its Gear to Block Web*, Wall St. J. (Oct. 29, 2011);[6] Loretta

---

[1] *Available at* http://www.bloomberg.com/news/2011-08-22/torture-in-bahrain-becomes-routine-with-help-from-nokia-siemens-networking.html.
[2] *Available at*
http://online.wsj.com/article/SB10001424052748704438104576219190417124226.html.
[3] *Available at* http://www.wired.com/science/discoveries/news/2006/05/70914.
[4] *Available at* http://www.bi-me.com/main.php?id=2047&t=1.
[5] *Available at* https://www.nytimes.com/2011/02/16/technology/16internet.html.
[6] *Available at*

CASE NO.: 12-CV-3683 TEH        OPP TO DEFENDANT'S MSJ AND CROSS-MSJ

Chao & Don Clark, *Cisco Poised to Help China Keep an Eye on Its Citizens*, Wall St. J. (July 5, 2011).[7]

Since 2007, for at least one category of technology requiring an export license—the export of devices used for "surreptitious listening"—Defendant has received, and granted, applications for export to Syria, Jordon, Gabon, Lebanon, United Arab Emirates, Afghanistan, Iraq, and Mexico. *See* Declaration of Mark Rumold ("Rumold Decl."), Exhibit A. The licenses ultimately granted for the export of this technology are not currently available to the public. Because of the opacity of the licensing process, it is unclear what type of technology Defendant regulates, on what basis, and under which regulations.

### 2. Regulatory Background and Defendant's Role in the Export of Surveillance Technology

The federal government, and Defendant in particular, is an active participant in the export of surveillance technology. In order to export some types of equipment used to intercept, monitor, or block communications, American companies must apply for, and receive, licenses from Defendant.

Overseas exports of products and technologies with commercial and military uses (so-called "dual-use" items) have been subject to federal regulation for sixty years. Originally, Congress played a substantial role in this regulation. In 1949, Congress passed the Export Control Act of 1949, Pub. L. No. 81-11, 63 Stat. 7, which established a statutory framework for regulating exports. The law was scheduled to sunset on June 30, 1951, but, before it did, Congress reauthorized it until June 30, 1953. *See* Pub. L. No. 82-33; 65 Stat. 43. This pattern—of expiration and reenactment prior to lapse—occurred seven times[8] before Congress again overhauled the export control system in 1969. *See* Export Administration Act of 1969, Pub. L. No. 91-184, 83

---

http://online.wsj.com/article/SB10001424052970203687504577001911398596328.html.

[7] *Available at*
http://online.wsj.com/article/SB10001424052970230477830457637714107267316.html.

[8] *See* Pub. L. No. 82-33, 65 Stat. 43 (enacted May 16, 1951; expired June 30, 1953); Pub. L. No. 83-62, 67 Stat. 62 (enacted June 16, 1953; expired June 30, 1956); Pub. L. No. 84-631, 70 Stat. 407, 408 (enacted June 29, 1956; expired June 30, 1958); Pub. L. No. 85-466, 72 Stat. 220 (enacted June 25, 1958; expired June 30, 1960); Pub. L. No. 86-464, 74 Stat. 130 (enacted May 13, 1960; expired June 30, 1962); Pub. L. No. 87-515, 76 Stat. 127-28 (enacted July 1, 1962; expired June 30, 1965); Pub. L. No. 89-63, 79 Stat. 209-10 (enacted June 30, 1965; expired June 30, 1969).

Stat. 841. A subsequent overhaul occurred in 1979. *See* Export Administration Act of 1979, Pub. L. No. 96-72, 93 Stat. 503.

However, the history of the Export Administration Act of 1979 ("EAA") reflects Congress's growing ambivalence toward it. Beginning in 1983,[9] Congress allowed the EAA to go into periods of lapse—sometimes for a series of days, sometimes for months, sometimes for years. *See, e.g.*, Pub. L. No. 98-207, 97 Stat. 1391 (reauthorizing EAA on December 5, 1983, after lapse on October 14, 1983); Pub. L. No. 103-277, 108 Stat. 1407 (reauthorizing EAA on July 5, 1994, after four day expiration). More recently, the EAA was in lapse from 1990 to 1993, and for over six years, from 1994 to 2000. *See* Pub. L. No. 103-10, 107 Stat. 40; Pub. L. No. 106-508; 114 Stat. 2360. Congress again allowed the EAA to lapse on August 20, 2001. As of the date of this filing, the EAA will have had no force for nearly twelve years.

The end of Congressional involvement in the nation's export regulation marked the beginning of the Executive's. During prior periods of lapse in the EAA, the President, through an executive order, has declared a national economic emergency under powers provided by the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1702(a)(1)(B). These executive orders provide that export regulations, previously authorized through the EAA, continue in effect under the President's authority. *See, e.g.*, Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17, 2001). The nation's export regulation program therefore continues uninterrupted, only under different legal authority. In August 2001, after the last lapse in the EAA, President George W. Bush declared such a "national emergency," which has continued unabated to this day. *Id*.

The export regulations—known as the Export Administration Regulations ("EAR"), 15 C.F.R. Pts. 730 -774 (2012)—set forth categories of regulated goods and the obligations of those companies seeking to export those goods. Regulated exports are divided into ten broad categories, such as "navigation and avionics," "electronics" and "telecommunications," and are then further subdivided into more narrow product groups within each broad category. *See* 15 C.F.R. § 738.2. The regulations provide short descriptions of the products falling within each regulated category.

---

[9] Congress actually began to allow the EAA to lapse as early as 1974, *see, e.g.*, Exec. Order No. 11,796, 39 Fed. Reg. 27,891 (July 30, 1975), however, beginning in 1983, the lapses became more pronounced and prolonged.

CASE NO.: 12-CV-3683 TEH          OPP TO DEFENDANT'S MSJ AND CROSS-MSJ

*See, e.g.*, 15 C.F.R. § 774 (Supplement No. 1) (2012). If a company seeks to export a product that falls within one of the regulated categories, the company must seek a license from Defendant prior to the product's export. 15 C.F.R. Pt. 750 (2012).

### 3.    EFF's FOIA Request for Records Concerning Exports of Surveillance Technology

By letter dated May 7, 2012 and sent by email to Defendant, Plaintiff requested under FOIA all agency records (including, but not limited to, electronic records) created from 2006 to the present, concerning "the export of devices, software, or technology primarily used to intercept or block communications." Compl. ¶ 13 (ECF No. 1).[10]

By letter dated June 5, 2012, Defendant responded to Plaintiff's FOIA request, releasing two pages of records and withholding all other responsive records in full under Exemption 3 of FOIA, 5 U.S.C. § 552(b)(3). *Id* ¶ 16. By letter dated June 11, 2012, and sent by email, Plaintiff submitted an administrative appeal to Defendant, challenging both Defendant's improper withholding of responsive records and the adequacy of Defendant's search for responsive records. *Id*. ¶ 17.

After Defendant failed to comply with FOIA's twenty working-day requirement for resolving appeals, EFF filed suit. *Id*. ¶ 18. Defendant moved for summary judgment on January 22, 2013, and EFF now cross-moves for summary judgment.

### ARGUMENT

## I.    FOIA, SUMMARY JUDGMENT, AND THIS COURT'S *DE NOVO* REVIEW

FOIA is intended to safeguard the American public's right to know "what their Government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (internal citation and quotation omitted).  The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against

---

[10] EFF's request highlighted, but was not limited to, one particular subset of these records: "All export license applications classified under Export Control Classification Numbers 5A980, 5D980, and 5E980, including any records reflecting those license applications that were granted or denied," as well as "[a]ll agency guidelines, policies, or analyses reflecting or concerning the types of systems, equipment and components, software, or technology" that are "primarily useful for the surreptitious interception of wire, oral, or electronic communications." *Id*. ¶ 14.

corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

FOIA requires disclosure of all agency records at the request of the public unless the records fall within one of nine narrow exemptions. *See* 5 U.S.C. § 552(b). These "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The exemptions "have been consistently given a narrow compass[,]" and agency records that "do not fall within one of the exemptions are improperly withheld." *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (internal quotation marks omitted).

FOIA disputes involving the propriety of agency withholdings are commonly resolved on summary judgment. *See, e.g.*, *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1115 (9th Cir. 1988). Summary judgment is proper when the moving party shows that "there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Feshbach v. SEC*, 5 F. Supp. 2d 774, 779 (N.D. Cal. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party who bears the burden of proof on an issue at trial "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Feshbach*, 5 F. Supp. 2d at 779. "In contrast, a moving party who will not have the burden of proof on an issue at trial can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id*.

A court reviews the government's withholding of agency records *de novo*, and the government bears the burden of proving records have been properly withheld. 5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755. An agency must prove that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and quotation omitted). All doubts as to whether a FOIA exemption applies are resolved in favor of disclosure. *Church of Scientology v. IRS*, 995 F.2d 916, 919 (9th Cir. 1993).

## II.    FOIA'S EXEMPTION 3 DOES NOT SHIELD THE REQUESTED RECORDS FROM DISCLOSURE

Defendant's withholding claims under Exemption 3 are extraordinary and unsupported. To withhold records under Exemption 3 of FOIA, Defendant must demonstrate that the requested records are "specifically exempted from disclosure" by a collateral withholding statute. 5 U.S.C. § 552(b)(3). To qualify as a withholding statute under Exemption 3, the statute must either "(i) require[] that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establish[] particular criteria for withholding or refer[] to particular types of matters to be withheld[.]" 5 U.S.C. § 552(b)(3)(A). Here, critically, there is no statute in force that qualifies as an Exemption 3 statute, and Defendant's attempt to meld a lapsed statute, a statutory grant of discretionary Executive authority, and various executive orders into such a statute are insufficient to satisfy Exemption 3's strict requirements.

### A.    A "Legislative Scheme" is Not a Collateral "Statute" that Justifies Defendant's Exemption 3 Withholdings

Exemption 3 has a "plain meaning:" it "unambiguously excepts from disclosure any matters that are 'specifically exempted from disclosure *by statute*[.]'" *Mudge Rose Guthrie Alexander & Ferdon v. U.S. Inter'l Trade Comm'n*, 846 F.2d 1527, 1530 (D.C. Cir. 1988) (emphasis added). Under Exemption 3, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990). Thus, the first step in a court's inquiry is "whether there is a statute within the scope of Exemption 3." *Gordon v. FBI*, 390 F. Supp. 2d 897, 900 (N.D. Cal. 2004) (citing *Minier v. CIA*, 88 F.3d 796, 801 (9th Cir. 1996)). Here, the Court need not proceed any further: Defendant's claim fails at the first step.

Nevertheless, and instead of identifying a statute on which to base its withholding claim, Defendant attempts to rewrite the text of Exemption 3 to permit withholding under a "legislative scheme." Def. Mem. at 11-15. Defendant attempts to argue that a mélange of a decade-long lapsed statute, executive orders, and broad grants of executive authority somehow adds up to a "statute" sufficient to satisfy Exemption 3's plain textual requirements. *Id*. But no part of Defendant's legal

stew—taken individually or as a whole—constitutes a withholding statute within the plain meaning of Exemption 3.

1.      Because the EAA Lapsed Over a Decade Ago, It Is Not a Statute for Exemption 3 Purposes

The first ingredient in Defendant's "legislative scheme" is the confidentiality provision of the now-defunct Export Administration Act ("EAA"). *See* Pub. L. No. 96-72, 93 Stat. 503 (Sep. 29, 1979), 50 U.S.C. App. § 2411(c).[11] Undeniably, the EAA had a confidentiality provision which specifically exempted from disclosure "information obtained for the purpose of, consideration of, or concerning, license applications under the EAA." 50 U.S.C. App. § 2411(c)(1). Critically, and as Defendant concedes, the EAA lapsed over a decade ago on August 20, 2001.[12] Thus, for nearly twelve years, the EAA has carried "no more force than . . . the Sedition Act of 1798. It simply 'no longer exists. Its life is at an end.'" *Wisconsin Project on Nuclear Arms Control v. Dep't of Commerce*, 317 F.3d 275, 285 (D.C. Cir. 2003) (Randolph, J., *dissenting*) (citing *Greenwood v. Freight Co.*, 105 U.S. 13, 18 (1881)).

Indeed, by the EAA's own terms, the "authority granted by this Act . . . terminate[d] on August 20, 2001." 50 U.S.C. App. § 2419. Thus, any authority to withhold records under Exemption 3 granted by the EAA "became a dead letter" over a decade ago. *Burke v. Barnes*, 479 U.S. 361, 364 (1987) ("We see no reason to treat . . . the validity of a statute that has expired any differently from . . . the validity of a statute that has been repealed[.]"). Because the EAA has not carried the force of law for over a decade, it cannot serve as a withholding statute under

---

[11] Although the EAA remains codified in the United States Code, its presence in the Code is not evidence of its lawful force. Revisions of the Code are only periodic and there is no requirement to cull lapsed laws, which means that at any given time the Code may contain laws that are not currently in effect. *See* 2 U.S.C. § 285b. Generally speaking, the Code is only *prima facie* evidence of the law, unless a section of the Code has been enacted into positive law. 1 U.S.C. § 204(a). Title 50 has not been enacted into positive law. *See About the Office and the United States Code*, OFFICE OF THE LAW REVISION COUNSEL, http://uscode.house.gov/about/info.shtml (last visited Feb. 20, 2013). Where Congress has not enacted a title of the Code, the Statutes at Large are the only legal evidence of the law. 1 U.S.C. § 112; Charles S. Zinn, *Revision of the United States Code*, 51 Law Libr. J. 388, 389-90 (1958).

[12] EFF concedes that, were the EAA in force, this Circuit's decision in *Lessner v. Dep't of Commerce*, 827 F.2d 1333 (9th Cir. 1987) that Section 12(c) is a withholding statute under Exemption 3 would be controlling.

Exemption 3. *See Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1284 (D.C. Cir. 1983) ("To invoke Exemption 3, an agency must demonstrate that [] a statute exists and was in effect at the time of the request[.]"). Thus, the EAA cannot serve as the basis for Defendant's withholding claims.

> 2. <u>IEEPA's Sweeping Provisions Do Not Constitute a Withholding Statute Under Exemption 3</u>

The second ingredient in Defendant's purported "legislative scheme" is the International Emergency Economic Powers Act ("IEEPA"). Pub. L. No. 95-223, 91 Stat. 1626 (Dec. 28, 1977), *codified at* 50 U.S.C. §§ 1701-1706. In contrast to the EAA, IEEPA is a current statute which actually carries the force of law. However, IEEPA's sweeping grant of discretionary authority cannot be reconciled with the specific requirements needed to qualify as an Exemption 3 statute.

To withhold records under Exemption 3, the collateral statute must either "leave no discretion on the issue" or establish "particular criteria for withholding or refer[] to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). A statute, therefore, "must *on its face* exempt matters from disclosure. [The Court] must find a congressional purpose [to] exempt matters from disclosure in the actual words of the statute . . . not in the legislative history of the claimed withholding statute, nor in an agency's interpretation of the statute." *Nat'l Assoc. of Home Builders v. Norton*, 309 F. 3d 26, 38 (D.C. Cir. 2002). (emphasis in original). Defendant fails to specify which provision of IEEPA it believes "specifically exempt[s]" records from disclosure. 5 U.S.C. § 552(b)(3); *see* Def. Mem. at 15-18. Regardless, the generalized and sweeping authority granted the President by IEEPA fails to satisfy Exemption 3's requirements.

In full, IEEPA provides the President may, during times of "national emergency":

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(B). The text of IEEPA does not "refer to particular criteria for withholding," let alone refer to *any* criteria; it does not refer to "particular types of matters to be

10

withheld," let alone refer to withholding at all. *See Nat'l Assoc. of Homebuilders*, 309 F.3d at 37 (rejecting Exemption 3 claim where "nothing in [the statute's] language refers to nondisclosure of information"); *see also Pub. Citizen*, 704 F.2d at 1285 (rejecting Exemption 3 withholding where statute did not exempt from disclosure "on its face").

Moreover, IEEPA does not leave the Executive with "no discretion on the issue" of withholding. 5 U.S.C. § 552(b)(3). Instead, it is the epitome of absolute discretion: its plain terms don't require the President to do *anything*. *See* 50 U.S.C. § 1702(a)(1) (providing the "President *may,* under such regulations as he *may* prescribe" take actions under IEEPA) (emphasis added); *see also Church of Scientology*, 633 F.2d at 1333 (finding statute that provided agency with "total discretion" regarding disclosure of its investigatory files, not to be Exemption 3 statute); *Reporters Comm. for Freedom of the Press v. Dep't of Justice,* 816 F.2d 730, 736 (D.C. Cir. 1987) (rejecting agency withholding claim where statute provided "apparently unbounded" discretion), *modified on other grounds*, 831 F.2d 1124 (D.C. Cir. 1987), *rev'd on other grounds*, 489 U.S. 749 (1989).

Thus, IEEPA's broad grant of discretionary authority does not satisfy Exemption 3's exacting requirements.

### 3.   An Executive Order is Not a Statute and Therefore Cannot Justify Withholding Under Exemption 3

The final ingredient in Defendant's "legislative scheme" is a series of executive orders, issued pursuant to the President's broad discretionary authority under IEEPA, which Defendant argues breathes force back into the long-dormant EAA. *See* Def. Mem. at 13-15. But an executive order, whatever its legal effect, is not a statute. *See, e.g.*, *Chamber of Commerce v. Reich*, 83 F.3d 439 (D.C. Cir. 1996) (discussing differences between "statute" and "executive order").

Exemption 3 requires a collateral statute, and courts have rejected agency attempts to rely on non-statutory authority to form the basis for withholding. *See Founding Church of Scientology v. Bell*, 603 F.2d 945, 952 (D.C. Cir. 1979) (court rules do not qualify under Exemption 3); *Public Citizen v. USTR*, 804 F. Supp. 385, 388 (D.D.C. 1992) (trade agreement not ratified by Senate is not a statute for Exemption 3 purposes); *but see Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.*, 656 F.2d 856, 867 (D.C. Cir. 1981) (Federal Rule of Criminal Procedure constitutes a statute because it was "positively enacted by Congress."). An executive order that

11

seeks to continue a lapsed statute's effect does not satisfy Exemption 3, even if the order has the effect of law and is within the President's authority.

Obviously, a "statute" is "[a] formal written enactment of a *legislative* body [. . . ;] An act of the *legislature* declaring, commanding, or prohibiting something; a particular law enacted and established by the will of the *legislative* department of government; the written will of the *legislature*, solemnly expressed according to the forms necessary to constitute it the law of the state." *Mgmt. Recruiters Intern., Inc. v. Bloor*, 129 F.3d 851, 855 n.1 (6th Cir. 1997) (quoting Black's Law Dictionary 1410 6th ed. 1990) (emphasis added). For purposes of this case, the defining characteristic of a "statute" is its enactment by the legislative branch. In contrast, an "executive order" is just that—an order issued by the Executive branch. And, even where an "[e]xecutive [o]rder has the force and effect of law, it is not a statute[.]" *United States v. Trucking Mgmt.*, *Inc*., 662 F.2d 36, 42 (D.C. Cir. 1981) (internal citations and quotations omitted). Even if, as Defendant claims, the executive orders here continued in effect the regulations issued under the EAA, the executive order does not, thereby, become an act of Congress. It is precisely because it is a *Presidential* requirement and not a *legislative* one that Defendant's reliance on the series of executive orders is unavailing. *Irons & Sears v. Dann,* 606 F.2d 1215, 1220 (D.C. Cir. 1979) ("Congress intended exemption from the FOIA to be a legislative determination and not an administrative one.") (footnote omitted).

In sum, no ingredient in Defendant's legislative scheme, taken individually or in combination, satisfies Exemption 3's criteria of withholding records that are "specifically exempted from disclosure by *statute*." 5 U.S.C. § 552(b)(3) (emphasis added). The EAA has not had any legal effect for over a decade. IEEPA's broad grant of discretionary authority does not constitute an Exemption 3 statute. And an executive order is not a statute enacted by Congress. Thus, Defendant's withholdings under Exemption 3 must fail.

**B.    The Current, Decade-Long Lapse in the EAA Makes This Case Factually Distinguishable from Both *Times Publishing* and *Wisconsin Project***

EFF acknowledges that the courts in *Wisconsin Project* and *Times Publishing* decided, in the government's favor, issues similar to those presented in this case. And Defendant's brief

recounts in detail the opinions of the Eleventh and D.C. Circuits in those cases. *See* Def. Mem. at 11-15. But Defendant fails to confront the single, critical fact—present in both the *Times Publishing* and *Wisconsin Project* cases—that is absent here: during the pendency of both cases, Congress re-enacted the EAA, specifically to provide Commerce with the authority to withhold under FOIA those applications generated during the EAA's lapse from 1994 to 2000. Here, in stark contrast, the EAA has been a dead letter for well over a decade. Thus, the Eleventh and D.C. Circuit's decisions must be interpreted against this legislative background. Without similar Congressional action, Defendant's attempts to withhold records under Exemption 3 should be rejected.

                1.      <u>Congress Reenacted the EAA in Response to Pending Litigation and to Give Commerce the Authority to Withhold Records Under Exemption 3</u>

Defendant makes sweeping claims about a generalized legislative intent under IEEPA and the lapsed EAA to allow the withholding of agency records at the Executive's discretion. *See* Def. Mem. at 11-18. But review of the Congressional record betrays Defendant's position. In November 2000, when both the *Times Publishing* and *Wisconsin Project* cases were pending, Congress reenacted the EAA. *See* Pub. L. No. 106-508, 114 Stat. 2360 (Nov. 13, 2000). Congress reenacted the statute because, in its view, Commerce was unable to withhold records under FOIA while the statute was in lapse. In particular, Congress acted, at least in part, to protect records from disclosure in the *Times Publishing* and *Wisconsin Project* cases.

Statements made by Members of Congress demonstrate that Congress believed reenactment of the EAA was necessary to provide Commerce the authority to withhold export application records under FOIA. For example, Representative Gillman commented that reenacting the EAA was necessary to "ensure[] that the [D]epartment can maintain its ability to protect from public disclosure information concerning export licenses." 146 Cong. Rec. H8022 (daily ed. Sept. 25, 2000) (statement of Rep. Gillman). Gillman further noted that "the department is coming under mounting legal challenges and is currently defending against two separate lawsuits seeking public release of export licensing provisions[.]" *Id*. Similarly, Representative Lee, specifically addressing the district court's decision in *Times Publishing*, stated: "[T]here has been a recent court ruling that calls into question whether or not the government can essentially hide behind emergency powers to

13

revive an expired law. . . *We have got to pass this law to make sure that they can keep the information confidential*[.]" 146 Cong. Rec. H11576 (daily ed. Oct. 30, 2000) (statement of Rep. Lee) (emphasis added); *see also* 146 Cong. Rec. H8022 (daily ed. Sep. 25, 2000) (statement of Rep. Pomeroy) (same, commenting on an earlier version of the House bill).

Members of Congress perceived the reenactment of the EAA as providing protection for records submitted from 1994 to 2001. Congress did not, as Defendant now claims, give Commerce a free-standing right to withhold export application records indefinitely into the future. For example, according to Representative Lee, extending the EAA to August 2001 would "ensure that the Department of Commerce will be able to rely on the Export Administration Act to protect the confidentiality of the relevant documents received since 1994, as well as the documents that the Commerce Department receives between now and [August 20, 2001]." 146 Cong. Rec. H11576 (daily ed. Oct. 30, 2000) (statement of Rep. Lee); *see also* 146 Cong. Rec. S11365 (daily ed. Oct. 30, 2000) (statement of Sen. Gramm) (noting that "replacing the 1994 expiration date with a 2001 expiration date" would allow Commerce to withhold "any information regarding license applications obtained *during that time period*") (emphasis added). Similarly, Representative Beureter, commenting on the effect of the reenacted EAA, stated: "Under the provisions of this measure, the Department of Commerce will be able to protect licensing information from the date of enactment *through August 20, 2001*." 146 Cong. H11575 (daily ed. Oct. 30, 2000) (statement of Rep. Bereuter).

If, as Defendant claims, the purported "legislative scheme" were sufficient for Defendant to withhold records under FOIA, Congress would not have needed to reenact the EAA in 2000: the freestanding "intent of Congress" would have been sufficient. However, the statements of Members of Congress directly contradict Defendant's claim here. Congress did not think the EAA, IEEPA, or any administrative regulations or executive orders were a self-perpetuating withholding "scheme." To the contrary, Congress believed its action in 2000 was necessary to provide Commerce the authority to withhold export applications under FOIA. Congress has not so acted here and has not so acted for over a decade.

2.     Both the *Times Publishing* and *Wisconsin Project* Cases Must Be Interpreted as Recognitions of the Congressional Action to Affect Those Cases

While both the Eleventh and D.C. Circuits ultimately upheld the ability of Commerce to withhold export application information requested during a period of lapse in the EAA, these holdings must be understood within the specific legislative context in which they occurred. During the pendency of both cases, Congress took action to renew the EAA, specifically with the goal of protecting applications received from 1994 to 2000. Here, in the absence of this type of specific Congressional action, both decisions are unpersuasive.

Indeed, prior to Congress's 2000 reenactment of the EAA, the district courts in both *Times Publishing* and *Wisconsin Project* soundly rejected the claims that Commerce attempts to make here—that the requested records are somehow exempt from disclosure under a lapsed EAA, IEEPA, or executive order.

When the *Times Publishing* district court considered Commerce's Exemption 3 claims, the EAA had been in lapse for nearly six years. 104 F. Supp. 2d 1361, 1363 (M.D. Fla. 2000) (*rev'd*, 236 F.3d 1286 (11th Cir. 2001)). There, the court correctly held the "Department's reliance upon an expired statute and non-statutory authorities as the basis for withholding the requested export information is entirely inconsistent with the requirements of narrow construction and full disclosure of FOIA." *Id*. at 1364. Thus, presented with precisely the same arguments and legislative background present here, the district court in *Times Publishing* properly rejected Commerce's claims.

The *Wisconsin Project* district court similarly rejected the claims raised by Defendant here. However, while the case was still before the district court, Congress reenacted the EAA. Thus, the district court's decision in *Wisconsin Project* primarily addressed the retroactive application of the recently reenacted statute. Rumold Decl., Exhibit B (*Wisconsin Project*, 99-cv-02673 (D.D.C. Sept. 4, 2001)). Nevertheless, Judge Kessler expressly rejected the claims now advanced by Defendant:

> As a final matter, the Court observes that absent the underlying confidentiality statute, namely the [recently] amended EAA, the information in question could not have been properly withheld under Exemption 3. As noted above, during the course of the briefing of the Exemption 3 issue, Defendant had argued that notwithstanding the EAA's expiration on August 20, 1994, the Court could find that Exemption 3 applies. Its argument was that a statute in effect was not

required for Exemption 3, so long as it was clear from other sources that Congress intended confidentiality.

The plain language of Exemption 3, however, makes clear that only a statute in effect exempting the requested material will satisfy Exemption 3. If Congress intended FOIA Exemption 3 to also cover those cases where there is no underlying statute in effect but where Congressional intent could be pieced together from other sources, it certainly knew how to draft language to state that expressly. The Court deems it unwise to second-guess Congress and proceed down the slippery-slope of determining when Exemption 3 is satisfied by something less than a statute and when it is not.

*Id.* at 11-12 (footnote omitted). Thus, contrary to Defendant's claims, the district courts in both *Times Publishing* and *Wisconsin Project* rejected precisely the argument advanced by Defendant here.

In contrast, the decisions of the Eleventh and D.C. Circuits must be seen as a recognition of Congress's recent reenactment of the EAA. In *Times Publishing*, after the district court's decision and while the appeal was pending, Congress reenacted the EAA. *Times Publ'g*, 236 F.3d at 1291. Citing statements made by Members of Congress, *see supra*, and President Clinton's signing statement, the Court found sufficient evidence of Congress's intent to maintain the confidentiality of export applications during the time period at issue in that case. *Times Publ'ng*, 236 F.3d at 1291-92.

Confronted with a slightly more complicated legislative backdrop,[13] the D.C. Circuit held similarly in *Wisconsin Project*. But the D.C. Circuit's decision was not nearly so uncontroversial as Defendant makes it seem: neither the panel, nor the petition to rehear the case *en banc* were unanimous. 317 F.3d 275 (D.C. Cir. 2003) (Sentelle, Randolph, Js. and Ginsburg, C.J., dissenting from denial of rehearing *en banc*). Judge Randolph, dissenting from the panel decision, characterized the majority's "most curious opinion" as akin to something from *Alice in Wonderland*. *Wisconsin Project*, 317 F.3d at 285-86 (Randolph, J., dissenting). In particular, Judge Randolph flatly rejected the Department of Commerce's contention that the congressional intent of an expired statute somehow trumps the congressional intent of FOIA, an *actual* statute:

---

[13] In *Wisconsin Project*, the EAA was in lapse when the records were created, requested, and when suit was filed. *Wisconsin Project*, 317 F.3d at 279. Congress reenacted the EAA while the case was pending before the District Court. *Id*. Shortly after the District Court's decision, however, the EAA again went into lapse. *Id*.

16

> [The] reading of Exemption 3 to require a "statute," the majority explains, "strangles Congress's intent." In other words, the Export Act may be gone, but congressional intent lives on: Congress at one time wanted the Commerce Department to keep the information secret, and so it shall remain. No matter that the Freedom of Information Act – a real law – expresses Congress's intent to require a statute exempting the documents from disclosure when they are sought[.]

*Id*. at 285. Further, in rejecting Commerce's contention that the continuation of a lapsed statute's terms via executive order or regulation could constitute a statute, Judge Randolph noted "[i]t never occurred to me, or to the Framers of the Constitution, that the Executive could by the stroke of a pen convert expired legislation into an existing statute." *Id*. at 286. Judge Randolph succinctly concluded: "Congress amended Exemption 3 . . . to restrict the Executive's discretion to withhold information; it required, as a condition of nondisclosure, an explicit nondisclosure statute. *There is no such statute here*." *Id*. (internal citations omitted and emphasis added).

In both the *Times Publishing* and *Wisconsin Project* cases, Congress had recently reenacted the EAA, such that the reenacted statute arguably covered the time period in which those plaintiff's requests had been submitted and the responsive records had been generated. There is no statute that could (even arguably) retroactively apply to the records at issue in this case. Here, the EAA has not had the force of law for nearly 12 years. It is not the province of the Executive to convert "by the stroke of a pen" Congressional inaction into binding statutory law. *See Wisconsin Project*, 317 F.3d at 286. Thus, because Exemption 3 requires a statute, Defendant's withholding claims must fail.

**C.     Defendant's Reliance on "the Actions of Concerned Entities" is Misplaced and Beside the Point**

Defendant suggests that the practices of companies, Congress, courts, and the Executive Branch demonstrate the "universal" expectation that export applications will remain confidential. However, it is not at all clear what Defendant believes these "actions" demonstrate. Regardless, Defendant's arguments are misplaced and beside the point.

First, Defendant suggests that the actions and expectations of exporters concerning confidentiality somehow provide evidence that the records may be withheld under Exemption 3. However, *even if* the lapsed confidentiality provision of the EAA were in force, it would not provide exporters with absolute confidentiality. *See* 50 U.S.C. App. § 2411(c)(1). Instead, the EAA provided that export applications could be disclosed whenever it was determined to be "in the

national interest." *Id.* Thus, exporters would have no expectation of absolute confidentiality in the applications they submitted, because disclosure could have occurred anytime the Secretary of Commerce determined it to be appropriate. But even setting aside whether or not exporters' expectations would be altered, the impact disclosure would have on such expectations is wholly irrelevant to the question of whether Congress "specifically exempted" the applications from disclosure by statute. *See* 5 U.S.C. § 552(b)(3).

Defendant also suggests that Congress's actions during times of lapse in the EAA somehow demonstrate the legitimacy of Defendant's Exemption 3 claims. Def. Mem. at 16-17. But Congress's actions and inactions are immaterial when untethered to a statute. *See Int'l Union, United Automobile, Aerospace & Agric. Implement Workers of America v. Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984). "[A]s far as the courts are concerned," the only relevant consideration is what Congress required through the only means that it can "require anything—the enactment of legislation." *Id.*; *see also Sullivan v. Finklestein*, 496 U.S. 617, 631 (1990) (Scalia, J., concurring in part) (noting that "'[s]ubsequent legislative history'—which presumably means the post-enactment history of a statute's consideration and enactment—is a contradiction in terms"). It is impossible to determine whether Congressional action or inaction, untethered to a statute, "represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice." *Johnson v. Transportation Agency*, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting). It does not, as Defendant suggests, mean that Congress intended Defendant to withhold export applications under Exemption 3.

Defendant next suggests that courts' decisions to uphold criminal penalties under export regulations somehow demonstrate that its Exemption 3 claims are appropriate. *See* Def. Mem. at 17 (asserting that "Courts, too honor provision of the EAA during periods of lapse"). But none of the cases cited by Defendant "honor the provisions of the *EAA*"; instead, the decisions hold convictions occurring under the *export regulations* are valid exercises of delegated authority. *See, e.g.*, *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1079 (9th Cir. 1982) (upholding conviction under export regulations); *United States v. Mechanic*, 809 F.2d 1111, 1112-

18

15 (5th Cir. 1987). EFF does not contest that the President, through IEEPA, can validly issue or extend export regulations.[14] But that concession says nothing of the force of those regulations when, as here, those regulations are invoked *in lieu of* a statute. That some courts have upheld the Executive's authority to promulgate regulations and, even, enforce criminal penalties under those regulations is entirely beside the point. Regulations do not become statutes sufficient to satisfy Exemption 3 just because the Executive Branch so desires.

Finally, Defendant notes the expectations and practices of the Executive Branch are inconsistent with disclosure. But setting aside that FOIA was specifically designed to combat administrative expectations of confidentiality, *see Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976), the fact that Defendant acts in accordance with what it *believes the law to be* says nothing about what the law actually *is*. It is also entirely beside the point. Defendant may indeed be bound by the regulations issued under IEEPA. But it is also bound by FOIA and, in this case, the clear statutory disclosure requirement of FOIA trumps whatever Executive determination has been made to the contrary.

### D. The Supreme Court's Decision in *Milner* Makes Clear that Defendant's "Text-Light" Approach to Exemption 3 is Incorrect

Defendant argues that, despite the plain language of FOIA, the word "statute" in Exemption 3 may be replaced with "legislative scheme," thereby exempting the records requested by EFF. But the Supreme Court's recent decision in *Milner v. Dep't of the Navy*, 562 U.S. __, 131 S. Ct. 1259 (2011), makes it abundantly clear that Defendant's "text-light" approach to FOIA—as well as the approaches taken by the *Times Publishing* and *Wisconsin Project* courts—must be rejected. 131 S. Ct. at 1267.

In an 8-1 decision, the *Milner* Court eliminated the so-called "High 2" FOIA exemption. *Id*. at 1262. While the exemptions at issue in *Milner* and this case are distinct, the interpretative approach to FOIA set forth in *Milner* governs here. The *Milner* Court rejected the Navy's proposed interpretation of Exemption 2, noting "the only way to arrive at [the Navy's interpretation] is by taking a red pen to the statute—"cutting out some" words and "pasting in others[.]" *Id*. at 1267

---

[14] And, indeed, the President is free to use the scheme established by Congress as a blueprint for those regulations.

(citing *Elliott v. Dep't of Agric.*, 596 F.3d 842, 845 (D.C. Cir. 2010)). Moreover, in rejecting the Navy's approach, the Court underscored the "fundamental point" that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Id.* (citing *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) (declining to consult legislative history when "that history is more conflicting than the text is ambiguous")). "When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language." *Id.*

Here, Defendant urges this Court to adopt a similarly "text-light" approach to interpreting FOIA. Defendant would have the Court "cut[] out" the word "statute" in Exemption 3 and "past[e] in" the word "legislative scheme" or even "executive order." But such Executive discretion is precisely what Congress rejected when it passed Exemption 3, assuring "that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch." *American Jewish Cong. v. Kreps*, 574 F.2d 624, 628 (D.C. Cir. 1978).

The plain language of Exemption 3 requires a collateral statute to exempt the records from disclosure: here, there is no such statute, and this Court should not be persuaded by Defendant's attempt to create ambiguity and confusion where none exists.

## III.   DEFENDANT HAS FAILED TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS, HAS ASSERTED EXEMPTIONS 4 AND 5 MORE BROADLY THAN THE LAW ALLOWS, AND HAS FAILED TO COMPLY WITH FOIA'S SEGREGABILITY REQUIREMENTS

On at least one point, EFF and Defendant are in complete agreement: this case is best approached by first addressing the propriety of Defendant's Exemption 3 claims. *See* Def. Mem. at 20. Defendant's extraordinary claims under Exemption 3 encompass all records at issue in this case in their entirety. Consequently, Defendant has not released responsive records, even in part, and has failed to provide the document-by-document description and analysis of responsive records typically required to satisfy an agency's burden under FOIA. Because of Defendant's broad Exemption 3 claims, and without any partially released records or particularized description of withheld records, it is impossible for this Court or EFF to fully assess Defendant's other exemption claims or its compliance with FOIA's other requirements. In light of this inability, EFF respectfully

1    urges the Court to, first, decide the applicability of Defendant's Exemption 3 claims, and, then,

2    order Defendant to re-process and release responsive records, with a more robust description of the

3    agency's search for responsive records, the reasons particular portions are exempt from disclosure,

4    and the agency's compliance with FOIA's segregability requirement.

5            Generally, an agency provides the requisite factual description of its search, withholdings,

6    and segregability decisions by offering a *Vaughn* index, which consists of a "relatively detailed"

7    description of withheld records, "specifically identifying the reasons why a particular exemption is

8    relevant and correlating those claims with the particular part of a withheld document to which they

9    apply." *Mead Data Central, Inc., v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)

10   (citing *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973)) (emphasis added). Without a

11   description of "*each* document or portion thereof withheld," and, for "*each* withholding," a

12   description of "the consequences of disclosing the sought-after information," Defendant

13   necessarily cannot satisfy its burden at summary judgment. *Bay Area Lawyers Alliance for Nuclear*

14   *Arms Control v. Dep't of State*, 818 F. Supp. 1291, 1296 (N.D. Cal. 1992) (emphasis in original)

15   (internal citations omitted). "[A]s a purely practical matter," a "document-by-document" *Vaughn*

16   index "will usually be necessary." *Judicial Watch v. USPS*, 297 F. Supp. 2d 252, 257 (D.D.C.

17   2004).

18           Here, however, Defendant has not even approximated the document-by-document analysis

19   that is typically required. Defendant states that forty-five export "case files" are responsive to

20   EFF's request, Albanese Decl., ¶ 15, but has given no indication of the contents of any case file,

21   the number of responsive records within each file, or the proportion of exempt and non-exempt

22   information within those records. As a consequence, both the Court and EFF are "comparatively

23   helpless to controvert" Defendant's claims. *See Vaughn*, 484 F.2d at 826 (noting that incomplete

24   descriptions of records force FOIA plaintiffs to argue "that the exception is very narrow and . . . the

25   general nature of the documents sought make it unlikely" that they are exempt). For this reason,

26   EFF urges this Court to reject Defendant's Exemption 3 claims and to order the re-processing and

27   release of responsive records.

28

Nevertheless, even without a sufficient factual basis to fully test Defendant's claims, some aspects of Defendant's claims are still possible to evaluate. As described below, Defendant has not satisfied its duty to conduct an adequate search for responsive records; Defendant has claimed Exemptions 4 and 5 more broadly than the law allows; and Defendant has failed to comply with FOIA's segregability requirement.

### A.       Defendant Has Failed to Conduct an Adequate Search for Responsive Records

Because Defendant has not released responsive records, even in part, and has not described any specific record with particularity, it is impossible to fully assess whether Defendant has complied with FOIA's search requirement. However, based upon the description of its search provided by Defendant, it appears Defendant has failed to conduct a search "reasonably calculated to uncover all relevant documents," as FOIA requires. *Zemansky v. EPA,* 767 F.2d 569, 571 (9th Cir. 1985) (citation omitted).

EFF requested "all agency records, created from 2006 to the present, concerning the export of devices, software, or technology primarily used to intercept or block communications." Compl. ¶¶ 13-14. However, Defendant states it interpreted the request as limited to applications for the export of "surreptitious listening" technology, a category of records specifically requested by EFF. Declaration of Eileen Albanese ("Albanese Decl.") ¶ 8 (ECF No. 20-2). But it is not clear that "surreptitious listening" technology encompasses *all* export categories for technology used to "intercept or block communications." For example, another regulated export category, ECCN 5A001.i, applies to "[s]ystems or equipment, specially designed or modified to intercept and process the air interface of 'mobile telecommunications,' and specially designed components therefor." 77 Fed. Reg. 39358 (July 2, 2012). Without some explanation from Defendant to the contrary, it appears that applications falling within this category would also satisfy EFF's request.[15] Moreover, Defendant repeatedly states that no technology is regulated because it is capable of "blocking" communications. *See e.g.*, Albanese Decl. ¶¶ 8, 22. Yet ECCN 5A001.f regulates

---

[15] ECCN 5A001.i was added to the category of regulated exports after EFF submitted its FOIA request. Nevertheless, Defendant may have previously regulated similar technology under another export category. EFF's primarily concern is Defendant's failure to address or search for potentially responsive records under any export category besides "surreptitious listening" technology.

"[j]amming equipment specially designed or modified to intentionally and selectively interfere with, deny, inhibit, degrade or seduce mobile telecommunication services." 15 C.F.R. Part 774 (Supp. 1). This category of technology, too, appears to fall within the scope of EFF's request. Indeed, Defendant appears to have unilaterally excluded and withheld certain inarguably responsive records from the scope of EFF's request. *See* Albanese Decl., ¶ 13 n.1 (excluding certain intra-agency correspondence with only the conclusory assertion that the records are "exempt from disclosure pursuant to the attorney-client privilege and deliberative process privilege of exemption b(5)").

These examples suggest that Defendant has interpreted EFF's FOIA request in an unacceptably narrow manner. *See Nation Magazine v. U.S. Customs Serv.,* 71 F.3d 885, 890 (D.C. Cir. 1995) (noting agencies are required to "construe a FOIA request liberally"); *Dunaway v. Webster,* 519 F.Supp. 1059, 1083 (N.D. Cal. 1981) (agency is "obliged to release any information . . . which relates to the subject of the request or which in any sense sheds light on, amplifies, or enlarges upon that material"). Thus, even in the absence of a document-by-document accounting of records, based solely on the description of Defendant's search, it appears Defendant has failed to comply with FOIA's requirement to conduct an adequate search.

### B. Defendant's Claims Under Exemptions 4 and 5 are Inadequately Supported and Patently Overbroad

Defendant candidly acknowledges that, in contrast to its claims under Exemption 3, only "portions" of responsive records have been withheld under Exemptions 4 and 5. Def. Mem. at 20. However, without a document-by-document description of withheld records, or some sense of the scope of Defendant's claims under Exemptions 4 and 5, it is impossible to fully assess the propriety of its withholdings.

FOIA's Exemption 4 protects "trade secrets and commercial or financial information" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Exemption 5, 5 U.S.C. § 552(b)(5), provides a narrow carve-out for records that are ordinarily privileged in civil discovery, including records protected by the deliberative process privilege. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). However, even in the absence of more particularly tailored descriptions of the withheld

records, it is apparent that Defendant's claims under Exemptions 4 and 5 are broader than the law allows.

### 1. Defendant's Claims Under Exemption 4 Are Overbroad

First, Defendant's claims for what constitutes "commercial or financial information" under Exemption 4 are demonstrably overbroad. Under the exemption, the "terms 'commercial or financial' are given their ordinary meanings." *Watkins v. CBP*, 643 F.3d 1189, 1194 (9th Cir. 2011). Examples of items generally regarded as "commercial or financial information" include: business sales statistics, research data, technical designs, overhead and operating costs, and information on financial conditions. *See, e.g.*, *Pub. Citizen,* 704 F.2d at 1286. Yet, here, Defendant claims even general information, such as the "[a]pplicant (name of the exporter)," the "model (of the item to be exported)," and, vaguely, "additional information," is all "commercial and financial" information within the meaning of the exemption. *See* Def. Mem. at 21-22. Such claims are inconsistent with the "ordinary meanings" of the terms and the types of information generally withheld under Exemption 4. *See, e.g.*, *Green v. Dep't of Commerce*, 468 F. Supp. 691, 694 (D.D.C. 1979) (holding information such as "name and address of U.S. exporter" not within Exemption 4).[16]

Even if withheld information is "commercial or financial information," it must also be "confidential." 5 U.S.C. § 552(b)(4). To determine whether information is "confidential" within the meaning of Exemption 4, courts in this Circuit apply the two-part test established in *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). *See GC Micro Corp. v. Def. Logistic Agency*, 33 F.3d 1109, 1112-13 (9th Cir. 1994). Under the *National Parks* test, information is "confidential" if disclosure would be likely "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Critical Mass Energy Project v.*

---

[16] Defendant approvingly cites *Lessner*, for the proposition that "export information, including identity, could be protected under Exemption4[.]" 827 F.2d at 1339-40. That sentence, however, was dicta and is inconsistent with Congress's actions in passing the confidentiality provision of the EAA. If Exemption 4 were sufficient to withhold all information contained within an export application, the amended confidentiality provision of the EAA would have been superfluous.

24

*Nuclear Regulatory Com'n*, 975 F.2d 871, 878 (D.C. Cir. 1992) (citing *National Parks*, 498 F.2d at 770).

Application of each of the *National Parks* prongs betrays Defendant's claims. First, disclosure of the information must "impair the Government's ability to obtain necessary information in the future." *Nat'l Parks*, 498 F.2d at 770. Yet the export licensing scheme, which Defendant incorrectly claims prohibits disclosure of the records in this case, also requires companies to submit applications prior to exporting regulated products. *See* 15 C.F.R. Pt. 750. Consequently, in order to export goods legally, companies are *required* to submit applications. *See id*. Thus, so long as companies continue to export regulated goods, there is no risk of impairing the government's ability to obtain the information in the future.

Defendant has similarly failed to show that disclosure of requested records would result in "substantial harm to the competitive position" of the applicants. *National Parks*, 498 F.2d at 770. "To satisfy the harm element, the government needs to show there is actual competition in the relevant market and a likelihood of substantial injury." *Watkins*, 643 F.3d at 1196. This requires agencies to either submit declarations from the companies whose information it seeks to protect or show that its declarants have expertise in the commercial area. *See, e.g.*, *GC Micro Corp*, 33 F.3d at 1113 (government's Exemption 4 withholdings supported by "declarations by officers of each of the three corporations involved"); *Raher v. Fed. Bureau of Prisons*, 749 F. Supp. 2d. 1148, 1156 (D. Ore. 2010) (letter from corporation opposing disclosure attached as exhibit to declaration); *Lion Raisins, Inc. v. U.S. Dept. of Agric*., 354 F.3d 1072, 1080 (9th Cir. 2004) (agency declarant provided adequate factual basis where declarant was in "almost daily contact" with companies in the relevant commercial market).

Here, defendant has failed to even identify "the relevant market" in which it is claiming applicants would be disadvantaged. *Watkins*, 643 F.3d at 1196. EFF's requested all records concerning exports used primarily to "intercept or block" communications. Compl. ¶¶ 13-14. But technologies that "intercept" or "block" communications, and their relevant markets, are diverse. For example, a small, hidden microphone might surreptitiously intercept oral communications, much the same way Narus's network monitoring technology, *see supra* at 3, might surreptitiously

intercept electronic communications. But the markets for the two types of technology are hardly similar and hardly involve the same type of competition. It seems particularly unlikely that these disparate markets could be described and expounded upon by a single declarant, as Defendant attempts to do in this case. *See generally* Declaration of Paul Freedenberg ("Freedenberg Decl."). While Dr. Freedenberg is undoubtedly knowledgeable about the export of technology *generally*, that general knowledge does not translate into competent evidence of the competitive positions and relevant markets in which these companies may compete. *See* Freedenberg Decl., ¶ 1.

In short, to adequately test Defendant's claims under Exemption 4, Defendant must provide more information: about the particular withheld records, about the types of technology described in the records, and about the relevant markets and competitive pressures in those markets. However, even in the absence of this information, it is apparent that Defendant's withholding claims under Exemption 4 are broader than the law allows.

## 2.   Defendant's Claims Under Exemption 5 Appear Similarly Overbroad

Defendant's withholdings under Exemption 5 also are broader than the law allows. Defendant has asserted Exemption 5 to protect notes taken by agency personnel in assessing an export application. Def. Mem. at 26-27. To withhold records under the privilege, an agency must establish that the withheld record is both "predecisional," meaning "it was generated before the adoption of an agency policy" and "deliberative," meaning "it reflects the give-and-take of the consultative process." *Judicial Watch, Inc., v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (internal quotations omitted).

However, even if a document is protected by the deliberative process privilege at the time it is prepared, the document can "lose that status if it is adopted, formally or informally, as the agency position on an issue[.]" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *see also Sears, Roebuck & Co.*, 421 U.S. at 161 (records lose privilege when they are expressly "adopt[ed] or incorporate[d] by reference" into agency final decisions). Here, where an agent's notes formed the basis for an agency decision or position actually adopted, the privilege may be unavailable. Defendant does not satisfy its burden by simply asserting that the notes were generated prior to the agency's decision on a particular export application.

1    Moreover, and, "[g]iven the underlying purpose of this privilege, it is no surprise that

2    '[f]actual material that does not reveal the deliberative process is not protected by this exemption.'"

3    *Nat'l Wildlife Fed.*, 861 F.2d at 1117 (citing *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir.1983)).

4    Thus, to the extent that factual information is contained within the agents' notes and impressions, it

5    must be segregated and released from the remaining document. Defendant has made no showing

6    concerning the factual content of the notes, or its ability to segregate and release information

7    contained therein.

8    Again, Defendant's failure to provide more searching and specific descriptions of the

9    withheld records precludes summary judgment on its Exemption 5 claims.

10   **C.    Defendant Has Failed to Comply with FOIA's Segregability Requirement**

11   Defendant's failure to release responsive records, even in part, precludes an assessment of

12   Defendant's compliance with FOIA's segregability requirement, which requires release of "[a]ny

13   reasonably segregable portion of a record . . . after deletion of the portions which are exempt."

14   5 U.S.C. § 552(b); *Pacific Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008).

15   "In the Ninth Circuit, the district court must review the agency's 'segregability' decisions

16   on a document-by-document basis." *NRDC v. Dep't of Defense*, 388 F. Supp. 2d 1086, 1096 (C.D.

17   Cal. 2005) (citing *Wiener v. FBI,* 943 F.2d 972, 988 (9th Cir. 1991)). "The district court must make

18   specific factual findings on the issue of segregability to establish that the required *de novo* review

19   of the agency's withholding decision has in fact taken place." *Alliance for Nuclear Arms Control*,

20   818 F. Supp. at 1296 (citing *Wiener*). So important is the segregability requirement to FOIA's

21   broad disclosure mandate that trial courts have an affirmative duty to consider the issue of

22   segregability *sua sponte*. *Trans-Pacific Policing Agreement*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

23   Indeed, "[i]t is error for a district court to simply approve the withholding of an entire document

24   without entering a finding on segregability, or the lack thereof." *Church of Scientology v. Dep't of*

25   *the Army*, 611 F.2d 738, 744 (9th Cir. 1979) (citations and internal quotation marks omitted).

26   This much is clear: because Exemption 3 does not apply to the withheld records, by failing

27   to release *any* record, even in part, Defendant has failed to comply with FOIA's segregability

28   requirement.  However, without a better sense of what records (or portions of records) are allegedly

1   exempt under Exemptions 4 and 5, neither this Court nor EFF can engage in the requisite

2   "document-by-document" analysis of the agency's segregability compliance. *NRDC*, 388 F. Supp.

3   2d at 1096.

4                                            **CONCLUSION**

5           Accordingly, and for the reasons explained above, Defendant's claim that all responsive

6   records are exempt in their entirety under Exemption 3 is meritless. Defendant has not—and,

7   indeed, *cannot*—point this Court to a statute that exempts from disclosure the records responsive to

8   EFF's FOIA request. No "legislative scheme," "administrative scheme," or expectation of any

9   party is sufficient to trump Exemption 3's plain requirement that records be "specifically exempted

10  from disclosure by *statute*." 5 U.S.C. § 552(b)(3) (emphasis added). There is no statute here, so

11  Defendant may not assert Exemption 3.

12          Therefore, EFF respectfully urges this Court to hold that Defendant's blanket assertion of

13  Exemption 3 is improper and to order the re-processing and release of all records responsive to

14  EFF's request. If the agency chooses to withhold information, it must provide reasons justifying

15  those withholdings on a document-by-document basis, consistent with the agency's obligations

16  under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

17

18  DATED:  February 20, 2013                 Respectfully submitted,

19                                            By   /s/ *Mark Rumold*
                                                  Mark Rumold
20                                                Jennifer Lynch
                                                  ELECTRONIC FRONTIER FOUNDATION
21                                                454 Shotwell Street
                                                  San Francisco, CA  94110
22                                                Telephone: (415) 436-9333
                                                  Facsimile: (415) 436-9993
23                                                mark@eff.org

24
                                                  Attorneys for Plaintiff
25                                                ELECTRONIC FRONTIER FOUNDATION

26

27

28

CASE NO.: 12-CV-3683 TEH          OPP TO DEFENDANT'S MSJ AND CROSS-MSJ